**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| YASMEEN WINSTON, *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 23 - 2123 (LLA) |
| GREGORY T. MONAHAN, *et al.*, | |
| *Defendants*. | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiffs Yasmeen Winston and India Johnson bring this action against the U.S. Park Police, the U.S. Secret Service, the Chief of the Park Police, the Director of the Secret Service, and several individual officers of both agencies, alleging constitutional violations and tort claims stemming from an incident with Park Police and Secret Service officers on the National Mall.  ECF No. 1.  Defendants have moved to dismiss.  ECF No. 23.  For the reasons explained below, the court grants in part and denies in part Defendants' motion to dismiss.

## I.    FACTUAL BACKGROUND

The following factual allegations drawn from Plaintiffs' complaint, ECF No. 1, are accepted as true for the purpose of evaluating the motion to dismiss, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  On July 30, 2020, Ms. Johnson and Ms. Winston took their infant children to the National Mall to visit the reflecting pool, fountains, and monuments.  ECF No. 1 ¶ 19. Ms. Johnson parked her car on Constitution Avenue near 17th Street, Northwest.  *Id.* ¶ 20. Ms. Winston was sitting in the passenger seat.  *Id.* ¶ 21.  Ms. Johnson's one-year-old son and Ms. Winston's six-month-old son were sitting in the back in their car seats.  *Id.*  The families had

planned to walk from Constitution Avenue to the World War II Memorial so the children could play in the fountain.  *Id.* ¶ 20.

Before Ms. Johnson and Ms. Winston could exit the vehicle, "they heard a loud noise and felt a powerful jolt."  *Id.* ¶ 22.  "To their shock, a marked United States Secret Service cruiser had crossed Constitution Avenue and deliberately and violently rammed the front driver side of Ms. Johnson's vehicle."  *Id.*  Two Secret Service officers, Daniel Mitchell and Joanne Armstrong, exited the vehicle with their guns drawn.  *Id.* ¶ 24; *see* ECF No. 23, at 1.  Officer Mitchell approached Ms. Johnson's vehicle, pointed his gun at Plaintiffs and their children, and screamed at Plaintiffs to "get out one by one and put [their] hands in the air."  ECF No. 1 ¶¶ 25-26.  Other Secret Service officers surrounded the vehicle, including Officers Jonathan Rustin, Officer James Thornton, and several unidentified officers ("United States Secret Service Officers Doe 1-10").  *Id.* ¶ 27; *see* ECF No. 23, at 1.  The officers "pointed guns at the back and side of the car, where the children were seated."  ECF No. 1 ¶ 27.  "Plaintiffs feared for their lives and the lives of their children."  *Id.* ¶ 25.

Ms. Johnson complied with Officer Mitchell's instructions and exited the vehicle with her hands up.  *Id.* ¶ 28.  She was then handcuffed by a Secret Service officer.  *Id.* ¶ 29.  Ms. Winston "remained frozen in the front passenger seat with her hands planted on the ceiling of the car.  She was terrified for herself and her infant child, who was screaming and crying in the backseat."  *Id.* ¶ 30.  Officer Mitchell pointed his rifle at Ms. Winston's head and screamed at her to unlock the door.  *Id.* ¶ 31.  Ms. Winston pleaded, "Don't shoot my baby!"  *Id.* ¶ 32.  She believed that she and her child were about to die.  *Id.*  After Ms. Winston unlocked the door and exited the vehicle, Officer Mitchell restrained and handcuffed her.  *Id.* ¶ 34.

Officer Rustin took Ms. Johnson and Ms. Winston, both handcuffed, about thirty to forty feet away from the vehicle. *Id.* ¶ 35. Their children "remained alone in the hot vehicle, crying hysterically for their mothers." *Id.* A female officer frisked and patted down both women. *Id.* ¶ 36. United States Park Police Officers Doe 1-10 arrived at the scene to support the Secret Service in detaining Plaintiffs. *Id.* ¶ 37. When bystanders gathered and began filming the officers' conduct, "[t]he officers angrily and aggressively told the bystanders to stop." *Id.* ¶ 38.

Ms. Johnson and Ms. Winston remained detained and were kept away from their young children "for the better part of an hour." *Id.* ¶ 39. A Secret Service officer told Ms. Johnson that she and Ms. Wilson were being detained because the Secret Service "was investigating a stolen vehicle and looking for two black males." *Id.* ¶ 40. (Obviously, Ms. Johnson and Ms. Winston did not meet that description. *Id.*) The Secret Service officers never told the women that they were under arrest or administered *Miranda* warnings. *Id.* ¶¶ 41-42.

While Plaintiffs were detained, a Secret Service officer searched Ms. Johnson's vehicle without her permission or a warrant. *Id.* ¶¶ 46-47. When Officer Rustin asked Ms. Johnson to show proof of her ownership of the car, she provided the title and car registration. *Id.* ¶ 48. Those items were never returned to her. *Id.* While the women were detained, Secret Service officers "attempted to remove the dent they caused on Ms. Johnson's vehicle, without Ms. Johnson's consent and without first taking photographs or otherwise memorializing the damage done to the vehicle." *Id.* ¶ 49.

Plaintiffs could see and hear their children crying throughout the time they were detained. *Id.* ¶ 45. They pleaded with the officers to be closer to their children. *Id.* ¶ 43. After about thirty minutes, Secret Service officers moved them closer to the children, but Plaintiffs remained detained. *Id.* At one point, the officers contacted emergency medical services to come to the scene

3

and assess the children's condition. *Id.* ¶ 39. Ms. Winston asked to breastfeed her son, but Secret Service officers refused. *Id.* ¶ 44.

After roughly an hour, Ms. Johnson and Ms. Winston "were released from detention and reunited with their terrified children." *Id.* ¶ 50. An ambulance transported them to Howard University Hospital for examination. *Id.* ¶ 51. When Plaintiffs returned to Constitution Avenue later to pick up Ms. Johnson's car, "a marked U.S. Secret Service vehicle shone its floodlight on the women in a harassing and intimidating manner." *Id.* ¶ 52. Plaintiffs allege that, because of this ordeal, they suffer ongoing "physical, emotional, psychological, and mental injuries." *Id.* ¶ 56.

The Secret Service did not respond to Freedom of Information Act ("FOIA") requests concerning the incident and ignored a letter from the U.S. House of Representatives Committee on Oversight and Reform, sent September 4, 2020, requesting information about the incident. *Id.* ¶ 58.

## II.    PROCEDURAL HISTORY

Ms. Johnson and Ms. Winston brought this action on July 21, 2023 against the following Defendants: the U.S. Park Police; its current and former Chiefs, Scott H. Brecht, Gregory T. Monahan, and Jessica Taylor; Park Police Officers Doe 1-10; the U.S. Secret Service; its current and former Directors, Sean M. Curran, James M. Murray, and Kimberly A. Cheatle; and Secret Service Officers Daniel Mitchell, Joanne Armstrong, Jonathan Rustin, James Thornton, and Doe 1-10. ECF No. 1 ¶¶ 3-14; *see* ECF No. 23, at 1.[1] Plaintiffs seek damages against Secret

---

[1] Plaintiffs sued former Park Police Chiefs Gregory T. Monahan and Jessica Taylor and former Secret Service Directors James M. Murray and Kimberly A. Cheatle in both their official and individual capacities. ECF No. 1. Their successors, Park Police Chief Scott H. Brecht and Secret Service Director Sean M. Curran, are "automatically substituted" as Defendants for Plaintiffs'

(*continued on next page*)

4

Service and Park Police officers under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), for violations of Plaintiffs' Fourth Amendment rights (Counts I and II).  ECF No. 1 ¶¶ 69-98.  Plaintiffs also allege tort claims under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346, 2671 *et seq.*, asserting negligent training, supervision, and retention by the Park Police Chiefs and Secret Service Directors (Counts III and IV), *id.* ¶¶ 99-124; unconstitutional patterns and practices by the Park Police and Secret Service (Counts V and VI), *id.* ¶¶ 125-142; intentional infliction of emotional distress ("IIED") by all Defendants (Counts VII and VIII), *id.* ¶¶ 143-162; and negligence by all Defendants (Counts IX and X), *id.* ¶¶ 163-176. They seek $2 million in damages for each count.  *See id.* ¶¶ 69-176.

In February 2024, Defendants moved to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  ECF No. 23.  Defendants filed a Westfall Act certification attesting that Defendants former Chief Monahan, former Chief Taylor, former Director Murray, former Director Cheatle, and Officers Mitchell, Armstrong, Rustin, and Thornton "were acting within the scope of their respective employment as officials and employees of the United States of America at the time of the alleged incidents."  ECF No. 23-4.  Plaintiffs filed an opposition, ECF No. 25, and voluntarily dismissed their unconstitutional pattern-and-practice claims (Counts V and VI), *see id.* at 5 n.2.  Defendants filed a reply.  ECF No. 27.  In August 2024, the court stayed the case, over Plaintiffs' objections, pending the D.C. Circuit's resolution of *Jones v. U.S. Secret Service*, No. 23-5288 (D.C. Cir.).  Aug. 6, 2024 Minute Order; *see* ECF No. 29 (providing the parties' divergent positions on whether a stay was warranted).

---

official-capacity claims.  Fed. R. Civ. P. 25(d).  But Mr. Monahan, Ms. Taylor, Mr. Murray, and Ms. Cheatle remain Defendants in their individual capacities.

The D.C. Circuit decided *Jones* in July 2025.  143 F.4th 489 (D.C. Cir. 2025).  As relevant here, the Court affirmed the district court's dismissal of *Bivens* claims against Secret Service officers who had allegedly conducted an unreasonable search and seizure and used excessive force against the plaintiff outside a Secret Service building.  *Id.* at 492-95.  This court subsequently permitted the parties to file supplemental briefs addressing *Jones*, Dec. 5, 2025 Minute Order, and Defendants filed a supplemental brief, ECF No. 32.  The motion to dismiss is thus fully briefed. ECF Nos. 23, 25, 27, 32.

## III.    LEGAL STANDARDS

### A.    Federal Rule of Civil Procedure 12(b)(1)

"Federal courts are courts of limited jurisdiction," and it is generally presumed that "a cause lies outside [of] this limited jurisdiction."  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).  Under Federal Rule of Civil Procedure 12(b)(1), the court must dismiss an action unless the plaintiff can establish, by a preponderance of the evidence, that the court possesses subject-matter jurisdiction.  *Green v. Stuyvesant*, 505 F. Supp. 2d 176, 177-78 (D.D.C. 2007).  In reviewing such a motion, the court "is not limited to the allegations set forth in the complaint" and "'may consider materials outside the pleadings.'"  *Morrow v. United States*, 723 F. Supp. 2d 71, 76 (D.D.C. 2010) (quoting *Jerome Stevens Pharms., Inc. v. Food & Drug Admin.*, 402 F.3d 1249, 1253 (D.C. Cir. 2005)).

### B.    Federal Rule of Civil Procedure 12(b)(6)

Under Federal Rule of Civil Procedure 12(b)(6), the court will dismiss a complaint that does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  In evaluating a motion under Rule 12(b)(6), a court accepts all well-pleaded factual allegations in the complaint as true.  *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *see also Atherton v. D.C. Off. of Mayor*, 567 F.3d 672, 681 (D.C. Cir. 2009).  Although the plausibility standard does not require "detailed factual allegations," it "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.  Nor will "'naked assertion[s]' devoid of 'further factual enhancement'" suffice. *Iqbal*, 556 U.S. at 678 (alteration in original) (quoting *Twombly*, 550 U.S. at 557).

In determining whether a complaint fails to state a claim, a court may consider only the facts alleged in the complaint and "any documents either attached to or incorporated in the complaint and matters of which [the court] may take judicial notice." *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1249 (D.C. Cir. 2020) (alteration in original) (quoting *Hurd v. District of Columbia*, 864 F.3d 671, 678 (D.C. Cir. 2017)).

## IV.    DISCUSSION

Plaintiffs allege *Bivens* claims for violations of the Fourth Amendment against Secret Service and Park Police officers in their individual capacities (Counts I and II), and FTCA claims for negligent training, supervision, and retention (Counts III and IV), IIED (Counts VII and VIII), and negligence (Counts IX and X).  ECF No. 1 ¶¶ 69-124, 143-176.  Defendants move to dismiss Plaintiffs' negligent training, supervision, and retention claims for lack of subject-matter jurisdiction and to dismiss all of Plaintiffs' claims for failure to state a claim.  ECF No. 23-1, at 9-45.  The court will grant Defendants' motion to dismiss Plaintiffs' *Bivens* and negligence claims with prejudice; grant the motion to dismiss the IIED claims without prejudice and allow

Plaintiffs to amend their complaint as to those claims; and deny the motion to dismiss the negligent training, supervision, and retention claims as premature and permit Plaintiffs to conduct limited jurisdictional discovery concerning the existence of Secret Service and Park Police directives that would establish the court's jurisdiction.

### A.   *Bivens* Claims (Counts I and II)

Plaintiffs allege that the Secret Service and Park Police officers violated their Fourth Amendment rights in two ways.  First, they allege that the officers used unreasonable and excessive force by ramming Ms. Johnson's vehicle, pointing loaded weapons at Plaintiffs and their children, and handcuffing and restraining Plaintiffs.  ECF No. 1 ¶¶ 72-76.  Second, they allege that the officers conducted unreasonable searches and seizures when they handcuffed, restrained, detained, and frisked Plaintiffs; illegally searched Ms. Johnson's vehicle without her permission, a warrant, or exigent circumstances; and confiscated Ms. Johnson's vehicle title and registration.  *Id.* ¶¶ 87-90.  Plaintiffs seek damages for these violations under *Bivens*.  *Id.* ¶¶ 83, 98.

In *Bivens*, the Supreme Court recognized that "victims of a constitutional violation by a federal agent have a right to recover damages against the official in federal court despite the absence of any statute conferring such a right."  *Carlson v. Green*, 446 U.S. 14, 18 (1980); *see Bivens*, 403 U.S. at 397.  Over the following decade, the Supreme Court twice recognized an implied right of action for other alleged constitutional violations: first, for a former congressional staffer's claim of sex discrimination under the Fifth Amendment, *see Davis v. Passman*, 442 U.S. 228, 245-48 (1979), and second, for a federal prisoner's claim of failure to provide adequate medical care under the Eighth Amendment, *see Carlson*, 446 U.S. at 16-19.  Since these three decisions, the Supreme Court "has consistently declined to extend *Bivens* to new contexts."  *Goldey v. Fields*, 606 U.S. 942, 945 (2025) (per curiam).  And while the Court has not overruled

*Bivens* and its progeny, the Court has cautioned that "creating implied causes of action under *Bivens* is 'a disfavored judicial activity.'" *Buchanan v. Barr*, 71 F.4th 1003, 1007 (D.C. Cir. 2023) (quoting *Egbert v. Boule*, 596 U.S. 482, 491 (2022)).

The Supreme Court has set forth a two-step inquiry for determining whether a *Bivens* remedy is appropriate. First, courts ask "whether the case presents 'a new *Bivens* context'—i.e., is it 'meaningful[ly]' different from the three cases in which the Court has implied a damages action." *Egbert*, 596 U.S. at 492 (alteration in original) (quoting *Ziglar v. Abbasi*, 582 U.S. 120, 139-40 (2017)). If the context is not new, the claim may proceed. Second, if the claim arises in a new context, courts ask whether, "absent any 'affirmative action by Congress,' there are any 'special factors counselling hesitation' against extending *Bivens* to that context." *Buchanan*, 71 F.4th at 1007 (quoting *Ziglar*, 582 U.S. at 136). These two steps "often resolve to a single question: whether there is any reason to think that Congress might be better equipped to create a damages remedy." *Egbert*, 596 U.S. at 492. "If there is even a single 'reason to pause before applying *Bivens* in a new context,' a court may not recognize a *Bivens* remedy." *Id.* (quoting *Hernández v. Mesa*, 589 U.S. 93, 102 (2020)).

Defendants argue that Plaintiffs' *Bivens* claims arise in a new context and special factors weigh against an extension of the *Bivens* remedy. Applying these principles here, the court agrees and will dismiss Plaintiffs' Fourth Amendment claims (Counts I and II).

### 1.    New context

"What constitutes a 'new context' is exceedingly broad." *Buchanan*, 71 F.4th at 1008. If the circumstances of a case differ from the Supreme Court's three prior *Bivens* cases "in a meaningful way," then the context is new. *Ziglar*, 582 U.S. at 139. In assessing whether a meaningful difference exists, courts look to a non-exhaustive list of factors including "the rank of

the officers involved," "the constitutional right at issue," "the generality or specificity of the official action," "the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted," "the statutory or other legal mandate under which the officer was operating," and "the risk of disruptive intrusion by the Judiciary into the functioning of other branches." *Id.* at 139-40.

Plaintiffs argue that their claims, like those in *Bivens*, allege Fourth Amendment violations arising out of warrantless searches and seizures and the use of excessive force. ECF No. 25-1, at 16-17; *see* ECF No. 1 ¶¶ 77, 92. But it is well established that "[a] claim may arise in a new context even if it is based on the same constitutional provision as a claim in a case in which a damages remedy was previously recognized." *Hernández*, 589 U.S at 103; *see Ziglar*, 582 U.S. at 139 (holding that cases can meaningfully differ even if they involve the same constitutional "right" and "mechanism of injury"). Here, the factual circumstances underlying Plaintiffs' claims differ meaningfully from those in *Bivens* itself. In *Bivens*, federal narcotics agents entered the plaintiff's apartment without a warrant, "manacled" him "in front of his wife and children," and then "searched the apartment from stem to stern." 403 U.S. at 389. Plaintiffs, however, allege that they were in public, parked near the National Mall, when the officers rammed Ms. Johnson's vehicle and detained them. ECF No. 1 ¶¶ 20-22. And, unlike in *Bivens*, the officers searched Ms. Johnson's vehicle as part of their investigation of a stolen vehicle in the area. ECF No. 1 ¶ 40.[2] These factual differences matter because intrusions into the home implicate distinct Fourth

---

[2] The parties dispute whether the court may take judicial notice of newspaper articles reporting that the Secret Service had been responding to an alert for a stolen vehicle that matched Plaintiffs' vehicle's description and license plate and whose occupants were reportedly "armed and dangerous." *See* ECF No. 23-1, at 4 & n.2, 22, 25; ECF No. 25-1, at 19 n.8, 23; ECF No. 27, at 14.

(*continued on next page*)

Amendment privacy interests than intrusions occurring outside the home or arising out of a vehicle stop. *See Florida v. Jardines*, 569 U.S. 1, 6 (2013) ("[W]hen it comes to the Fourth Amendment, the home is first among equals."); *Kaur v. Kellenberger*, No. 20-CV-1432, 2025 WL 1676005, at \*6 (D.D.C. June 13, 2025) ("*Bivens* characterized the core underlying rights at issue as 'primarily rights of privacy,' which are essentially near their zenith within one's home." (quoting *Bivens*, 403 U.S. at 390)), *report and recommendation adopted*, 2026 WL 575488 (D.D.C. Mar. 2, 2026), *appeal docketed*, No. 26-5079 (D.C. Cir. Mar. 13, 2026).  Different legal rules accordingly govern the reasonableness of a traffic stop, vehicle search, and warrantless search of a home. *See Lovett v. United States*, No. 23-CV-2879, 2024 WL 4286054, at \*4-5 (D.D.C. Sep. 25, 2024); *cf. United States v. Sokolow*, 490 U.S. 1, 7 (1989) (explaining that "the police can stop and briefly detain a person for investigative purposes if the officer has reasonable suspicion supported by articulable facts that criminal activity 'may be afoot'" (quoting *Terry v. Ohio*, 392 U.S. 1, 30 (1968))); *California v. Carney*, 471 U.S. 386, 390 (1985) (explaining that the basis for the automobile exception to the warrant requirement is "the ready mobility of the automobile [which] justifies a lesser degree of protection" than stationary structures).  Courts in this district have therefore consistently found new contexts countenancing against a *Bivens* remedy for search-and-seizure and excessive-force claims against line-level law enforcement officers arising

---

Defendants correctly note that the court may take judicial notice of news articles, *see* ECF No. 23-1, at 4 n.2, but that judicial notice is limited to the "existence or nature of [those] articles," *Fridman v. Bean LLC*, No. 17-CV-2041, 2019 WL 231751, at \*5 n.1 (D.D.C. Jan. 15, 2019) (collecting cases).  The court may not consider Defendants' cited articles for the truth of their assertions at the motion-to-dismiss stage without converting their motion into one for summary judgment.  *See Barrett v. Atl. Monthly Grp. LLC*, No. 22-CV-49, 2024 WL 4119400, at \*7 (D.D.C. Sep. 9, 2024) ("[A]s with all judicially noticed materials, it would not be proper to accept the assertions in the [news] articles for the truth of the matter asserted.").  The court therefore relies solely on the allegations in Plaintiffs' complaint regarding the officers' basis for stopping and detaining Plaintiffs.

outside the home.  *See, e.g.*, *Robinson v. Pilgram*, No. 20-CV-2965, 2021 WL 5987016, at *12 (D.D.C. Dec. 17, 2021) (concluding that an excessive-force claim raised a new *Bivens* context where the plaintiff's "harm stem[med] from [an] arrest outside the home"), *aff'd*, No. 22-5001, 2022 WL 3009621 (D.C. Cir. July 28, 2022) (per curiam); *Lovett*, 2024 WL 4286054, at *4-5 (finding a new context where the plaintiff's unreasonable-seizure and excessive-force claims arose out of a confrontation with Secret Service officers as the plaintiff was exiting his parked car); *Kaur*, 2025 WL 1676005, at *6 (finding a new context where the plaintiffs' unlawful-arrest and excessive-force claims arose in a "public setting on the National Mall"); *see also Buchanan*, 71 F.4th at 1008 (finding that "the clearing of protestors from a public park by federal law enforcement" presented a new context).  So too have courts "found that Fourth Amendment claims involving vehicle searches bring *Bivens* into a new context."  *Robinson*, 2021 WL 5987016, at *12 (concluding that Secret Service officers' search of a "private vehicle on a public street in the vicinity of the White House" presented a new context and collecting out-of-circuit cases about vehicle searches).

Plaintiffs' claims also concern a "new category of defendants" who operate under a distinct statutory or legal mandate.  *Egbert*, 596 U.S. at 492 (quoting *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 68 (2001)); *see Loumiet v. United States*, 948 F.3d 376, 382 (D.C. Cir. 2020) (holding that a new defendant category and distinct statutory mandate each indicated a new *Bivens* context). The Secret Service, which falls under the purview of the Department of Homeland Secretary, is responsible for "ensur[ing] the security of our country's highest-ranking officials," and its officers "perform[] unique tasks beyond those entrusted to other law enforcement officers."  *Jones v. U.S. Secret Serv.*, 701 F. Supp. 3d 4, 12 (D.D.C. 2023), *aff'd*, 143 F.4th 489 (D.C. Cir. 2025); *see* ECF No. 1 ¶ 4 (describing the Secret Service as "the federal agency responsible for providing security

12

for the former and current Presidents," among others).  Secret Service officers thus operate under a distinct statutory mandate to protect the President and other high-ranking officials "by investigating and thwarting threats to their security, their immediate families, and the buildings in which they live and work."  *Jones*, 701 F. Supp. 3d at 12; *see* 18 U.S.C. §§ 3056-3056A (setting out the powers, authorities, and duties of the Secret Service and Secret Service Uniformed Division); *Lovett*, 2024 WL 4286054, at *6 (describing the Secret Service as "a specialized agency with a narrowly limited mission and geographic jurisdiction"); *see also Zavadovsky v. Rabl*, No. 24-CV-1997, 2025 WL 2466024, at *13 (D.D.C. Aug. 27, 2025) (concluding that *Bivens* claims against Secret Service officials "involve[d] 'different conduct by different officers from a different agency' with a distinct mandate" (quoting *Cantú v. Moody*, 933 F.3d 414, 423 (5th Cir. 2019))).  And the Park Police, which is housed within the National Park Service, ECF No. 1 ¶ 3, is responsible for "day-to-day law enforcement within public spaces," including on the National Mall, *Kaur*, 2025 WL 1676005, at *8; *see Christian Knights of Ku Klux Klan Invisible Empire, Inc. v. District of Columbia*, 972 F.2d 365, 367 (D.C. Cir. 1992) (noting that the Park Police "has authority over the [Washington] Monument, the Mall, and the streets running through it").  In contrast to both Secret Service and Park Police officers, federal drug enforcement agents like those in *Bivens* fall under the purview of the Attorney General, and they enforce controlled substance laws and are primarily responsible for executing and serving warrants, making arrests, and seizing property.  *See Lovett*, 2024 WL 4286054, at *5-6 (explaining differences between Drug Enforcement Administration ("DEA") agents and Secret Service officers); *see also* 21 U.S.C. § 878 (outlining powers of DEA agents).  Here, Plaintiffs allege that they were near the National Mall when they were confronted by Secret Service and Park Police officers.  *See* ECF No. 1 ¶¶ 19-20.  These allegations are sufficient for the court to conclude that the officers were operating

13

under their distinct legal mandates to police and safeguard the areas surrounding the White House and National Mall at the time of the underlying events.[3]

The D.C. Circuit's recent decision in *Jones* further supports the court's conclusion. There, the D.C. Circuit held that Secret Service officers' search and seizure of an individual who had been filming a federal building presented a new *Bivens* context. 143 F.4th at 494. The Court explained that the case "create[d] a greater risk of judicial intrusion into the Executive Branch" than *Bivens*, because, unlike the agents in *Bivens*, the defendant officers had been "protecting a federal building from a perceived threat." *Id.* The Court held that a "case involv[ing] an unplanned encounter with unknown risks posed by an unidentified person" was meaningfully different from *Bivens*, which involved "a planned encounter with (at least) partially known risks posed by an identified person." *Id.* ("[T]he federal officers who arrested Bivens were not protecting *their* space; they intruded into *his* space.").

To be sure, this case presents a closer question than *Jones*. The officers were not, as Defendants concede, "directly protecting a building in the same manner as in *Jones*," ECF No. 32, at 5, and the officers' actions—conducting a traffic stop—are more akin to "law enforcement activity" than "the protective activity of guarding a federal building from perceived threats," *Jones*, 143 F.4th at 494. Plaintiffs also allege that the officers intruded into *their* space by ramming their parked vehicle. ECF No. 1 ¶ 22; *cf. Kaur*, 2025 WL 1676005, at *6 (concluding that there was a new *Bivens* context where the plaintiffs had "affirmatively injected themselves into law enforcement activity occurring in public"). Nevertheless, Plaintiffs' claims similarly arise out of

---

[3] Plaintiffs argue that controlling precedent has recognized *Bivens* claims against Secret Service and Park Police officers. ECF No. 25-1, at 17. But only one of their cited cases is binding on this court, and the issue there was whether Secret Service officers had qualified immunity, not whether a *Bivens* remedy was available. *See Reichle v. Howards*, 566 U.S. 658, 663 & n.4 (2012).

"an unplanned encounter with unknown risks posed by . . . unidentified person[s]." *Jones*, 143 F.4th at 494.  Plaintiffs allege that the Secret Service officers said they were "investigating a stolen vehicle and looking for two black males," ECF No. 1 ¶ 40, meaning Plaintiffs' confrontation with the officers was not a "planned encounter with . . . identified person[s]," *Jones*, 143 F.4th at 494. And, as in *Jones*, Plaintiffs' claims implicate the Secret Service's "protective duty" of safeguarding the White House.  *Jones*, 143 F.4th at 494.  While the officers here were not guarding the White House or another federal building directly, they were nevertheless engaged in "protective activity" of the National Mall, not far from the White House, when the alleged conduct occurred.

Plaintiffs rely on *Hicks v. Ferreyra*, 965 F.3d 302 (4th Cir. 2020), to argue that "courts regularly apply *Bivens* to Fourth Amendment claims arising from police traffic stops."  *Id.* at 311-12; *see* ECF No. 25-1, at 18-19.  In *Hicks*, the Fourth Circuit held that Park Police officers' unreasonable seizure of an individual parked on the shoulder of the Baltimore-Washington Parkway did not present a new *Bivens* context.  *Hicks v. Ferreyra*, 64 F.4th 156, 162-63 (4th Cir. 2023).  But *Hicks* is neither binding nor persuasive.[4]  The Fourth Circuit explained that the seizures in both *Hicks* and *Bivens* "were subject to the same objective inquiry of *reasonableness* mandated by Fourth Amendment jurisprudence," and even though a temporary traffic stop can be justified by a lesser showing than probable cause, that did not "alter the constitutional right at issue or its application to the routine enforcement of criminal laws."  *Id.* at 168 (emphasis added).  But this level of generality could apply to most, if not all, Fourth Amendment claims, since

---

[4] The *Hicks* Court also cited a D.C. Circuit decision, *Martin v. Malhoyt*, 830 F.2d 237 (D.C. Cir. 1987), for the proposition that courts have recognized *Bivens* claims arising out of routine traffic stops.  *See Hicks*, 965 F.3d at 311-12.  But *Martin* concerned qualified immunity and did not address whether the case presented a new *Bivens* context under the Supreme Court's current framework.  830 F.2d at 263.

"reasonableness" is "the ultimate touchstone of the Fourth Amendment." *Riley v. California*, 573 U.S. 373, 381-82 (2014) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)). And while *Ziglar* indeed reaffirmed the vitality of *Bivens* "in the search-and-seizure context *in which it arose*," 582 U.S. at 134 (emphasis added), the Supreme Court did *not* hold that *Bivens* relief is always available in the "warrantless-search-and-seizure context of routine law enforcement," *Hicks*, 64 F.4th at 166, since other meaningful differences can bring a case into a new context, *see Ziglar*, 582 U.S. at 139-40. And unlike *Hicks*, which arose out of a traffic stop on a highway, this case involves officers operating under a unique statutory mandate in the vicinity of the White House.[5]

Because "even a modest extension is still an extension," *Ziglar*, 582 U.S. at 147, the court concludes that the distinct factual circumstances and involvement of a new category of defendants operating under a unique statutory mandate in this case are sufficient to present a new *Bivens* context.

### 2.    Special factors

Next, the court considers whether any "special factors" weigh against recognizing a *Bivens* remedy in this new context. Courts may not recognize a *Bivens* remedy if "Congress already has provided, or has authorized the Executive to provide, 'an alternative remedial structure.'" *Egbert*, 596 U.S. at 493 (quoting *Ziglar*, 582 U.S. at 137). Here, Defendants point to several alternative remedies. ECF No. 23-1, at 26-30; *see Egbert*, 596 U.S. at 493 ("If there are alternative remedial

---

[5] The *Hicks* Court also declined to consider whether a special factor existed based on "alternative remedies" because the defendants had not identified any alternatives. *See* 64 F.4th at 168 n.3. As the court explains, *see infra* Section IV.A.2, Plaintiffs have alternative remedies here, further distinguishing this case from *Hicks*.

structures in place, 'that alone,' . . . is reason enough to 'limit the power of the Judiciary to infer a new *Bivens* cause of action.'" (quoting *Ziglar*, 582 U.S. at 137)); *Buchanan*, 71 F.4th at 1010 (holding that the presence of one special factor is "sufficient to preclude the availability of a *Bivens* remedy").

First, Defendants explain that "[a]ny person may report alleged misconduct by Secret Service personnel to the [Department of Homeland Security] Office of Inspector General."  ECF No. 23-1, at 27.  Second, individuals may also "report alleged wrongdoing, including claimed civil rights abuses, by Secret Service officers" to the Secret Service's Office of Professional Responsibility, Inspection Division, which investigates reports of misconduct and refers credible allegations to the Office of Integrity.  *Id.* at 27-28.  And third, individuals may report misconduct by Secret Service officers to the Department of Homeland Security's Officer for Civil Rights and Civil Liberties, which is responsible for "safeguarding against potential 'abuses of civil rights' and overseeing compliance 'relating to the civil rights and civil liberties of individuals affected by' Department of Homeland Security activities."  *Id.* at 28 (quoting 6 U.S.C. § 345(a)(1), (4), (6)).  These internal reporting and grievance procedures provide a "means through which allegedly unconstitutional actions . . . can be brought to the attention of the [Secret Service] and prevented from recurring."  *Malesko*, 534 U.S. at 74.

Plaintiffs counter that these remedies do not provide "*equally* effective remedial scheme[s]" because they do not provide for compensatory damages.  ECF No. 25-1, at 19-20 (quoting *Carlson*, 446 U.S. at 23 n.10).  But the Supreme Court has repeatedly emphasized that alternative remedies need not provide complete relief or be "as effective as an individual damages remedy."  *Bush v. Lucas*, 462 U.S. 367, 372 (1983); *see Egbert*, 596 U.S. at 498 (explaining that the "question whether a given remedy is adequate" is a "legislative determination" for "Congress,

not the federal courts" to make, and "[s]o long as Congress or the Executive has created a remedial process that it finds sufficient to secure an adequate level of deterrence, the courts cannot second-guess that calibration by superimposing a *Bivens* remedy"); *Davis v. Wernick*, No. 19-CV-3327, 2021 WL 310999, at *3 (D.D.C. Jan. 29, 2021) ("[I]t suffices for the special factors analysis that the alternative remedy in question vindicate the plaintiff's interest, not that it render a particular defendant liable for damages."). Here, it is sufficient that alternative remedies exist, regardless of whether they "cover the full breadth of harm that a would-be *Bivens* plaintiff alleges." *Liff v. Off. of Inspector Gen. for U.S. Dep't of Lab.*, 881 F.3d 912, 921 (D.C. Cir. 2018); *see Egbert*, 596 U.S. at 497-98 (holding that the Border Patrol's internal grievance procedures were enough to foreclose *Bivens* relief). And while Plaintiffs contend that the Secret Service is not obligated by statute or obligation to investigate complaints of misconduct, ECF No. 25-1, at 20, the Secret Service—like the Border Patrol in *Egbert*—is subject to the authority of the Security of Homeland Security, *see* 18 U.S.C. § 3056A. The Department of Homeland Security is therefore similarly "statutorily obligated to 'control, direc[t], and supervis[e] . . . all employees.'" *Egbert*, 596 U.S. at 497 (alterations in original) (quoting 8 U.S.C. § 1103(a)(2)); *see* 6 U.S.C. § 381 (transferring the Secret Service's "functions, personnel, assets, and obligations" to the Secretary of Homeland Security). The Department of Homeland Security's Officer for Civil Rights and Civil Liberties, too, is required by statute to "investigate complaints and information indicating possible abuses of civil rights or civil liberties, unless the Inspector General . . . determines that any such complaint or information should be investigated." 6 U.S.C. § 345(a)(6).

Lest there be any doubt, the processes offered by the Department of Homeland Security Inspector General and Officer for Civil Rights and Civil Liberties are the same alternative remedies that the D.C. Circuit deemed sufficient to foreclose relief in *Jones*. *See* 143 F.4th at 494-95; *see*

*also Lovett*, 2024 WL 4286054, at \*7 (considering these remedies sufficient safeguards to prevent constitutional violations by Secret Service officers). These alternative remedies are thus necessarily sufficient here. And while neither party has addressed the alternative remedies available to those aggrieved by Park Police personnel, courts have found that the Park Police has similar internal grievance procedures to those in *Egbert*, therefore precluding *Bivens* claims. *See Kaur*, 2025 WL 1676005, at \*8; *see also Gray v. Gomez*, 728 F. Supp. 3d 264, 273 (E.D.N.Y. 2024) (concluding that "the existence of the Park Police's complaint procedures *alone* forecloses" *Bivens* relief). Given the presence of these alternative remedial structures, the court cannot conclude that it is better qualified than Congress to determine whether a damages remedy against the officers is appropriate in this new context. And because only "one special factor is sufficient to preclude the availability of a *Bivens* remedy," *Buchanan*, 71 F.4th at 1010, the court need not address Defendants' other special factors arguments about national security concerns, legislative activity with regard to balancing civil liberties with presidential security, and the systemwide costs of extending *Bivens* to Plaintiffs' claims, ECF No. 23-1, at 29-33; *see, e.g.*, *Buchanan*, 71 F.4th at 1010 (declining to address the defendants' arguments about other special factors).

\*     \*     \*

Because Plaintiffs' *Bivens* claims arise in a "new context" and there is at least one "special factor" weighing against recognizing an implied remedy, the court will dismiss Plaintiffs' Fourth Amendment claims. *Egbert*, 596 U.S. at 492-93.[6]

---

[6] Given the court's conclusion that Plaintiffs' *Bivens* claims cannot proceed, the court need not address Defendants' alternative argument that they are entitled to qualified immunity. ECF No. 23-1, at 33-40; *see, e.g.*, *Carmer v. United States*, No. 22-CV-1100, 2024 WL 1603351, at \*10 (D.D.C. Apr. 12, 2024).

## B.    FTCA Claims

The FTCA waives sovereign immunity in suits against the United States "for injury or loss or property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government" if the employee was "acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1).   Plaintiffs allege FTCA claims against the federal government for negligent training, supervision, and retention (Counts III and IV), IIED (Counts VII and VIII), and negligence (Counts IX and X).  ECF No. 1 ¶¶ 99-124, 143-176.  The court begins by addressing Defendants' Westfall Act certification before turning to Defendants' arguments for dismissal.  The court will then deny the motion to dismiss as to the negligent training, supervision, and retention claims and permit Plaintiffs to conduct limited jurisdictional discovery for those claims; dismiss the IIED claims without prejudice and allow Plaintiffs to amend their complaint; and dismiss the negligence claims with prejudice.

### 1.    Westfall Act certification

As a threshold matter, the court will substitute the United States as the sole Defendant for Plaintiffs' FTCA claims and dismiss the individual Defendants.  The Federal Employees Liability Reform and Tort Compensation Act of 1988, Pub. L. No. 100-694, 102 Stat. 4563 (codified at 28 U.S.C. § 2679)—commonly referred to as the Westfall Act—"accords federal employees absolute immunity from common-law tort claims arising out of acts they undertake in the course of their official duties." *Osborn v. Haley*, 549 U.S. 225, 229 (2007).  The purpose of the Westfall Act "is to relieve covered employees from the cost and effort of defending [a] lawsuit, and to place those burdens on the Government's shoulders." *Wuterich v. Murtha*, 562 F.3d 375, 380 (D.C. Cir.

2009) (quoting *Osborn*, 549 U.S. at 252).   Under the Westfall Act, "an Attorney General or designee who believes that a federal employee was acting within the scope of employment at the time of the alleged incident may issue a certification to that effect," after which the United States is substituted as the defendant.  *Harbury v. Hayden*, 444 F. Supp. 2d 19, 28 (D.D.C. 2006); *see* 28 U.S.C. § 2679(d)(2).   "[T]he burden of challenging the correctness of a Westfall Act certification rests with the plaintiff," who must present more than "'[m]ere conclusory statements' . . . to rebut a certification."  *Steele v. Meyer*, 964 F. Supp. 2d 9, 17 (D.D.C. 2013) (quoting *Jacobs v. Vrobel*, 724 F.3d 217, 221 (D.C. Cir. 2013)).   The plaintiff is entitled to "discovery and an evidentiary hearing" only if there is a "genuine question of fact material to the scope-of-employment issue."  *Id.* (internal quotation marks omitted).

Here, Defendants filed a Westfall Act certification explaining that the named officer defendants—former Chief Monahan, former Chief Taylor, former Director Murray, former Director Cheatle, and Officers Mitchell, Armstrong, Rustin, and Thornton—"were acting within the scope of their respective employment as officials and employees of the United States of America at the time of the alleged incidents."  ECF No. 23-4.  This certification "constitute[s] *prima facie* evidence that the employee[s] w[ere] acting within the scope of [their] employment," *Wuterich*, 562 F.3d at 381 (first alteration in original) (quoting *Council on Am. Islamic Rels. v. Ballenger*, 444 F.3d 659, 662 (D.C. Cir. 2006) (per curiam)), and Plaintiffs do not allege any facts to rebut the presumption created by the certification.

Plaintiffs challenge the Westfall Act certification only with respect to the negligence and IIED claims.  ECF No. 25, at 38-39.  While Plaintiffs are correct that the certification does not refer to the unidentified Secret Service and Park Police officers who are defendants to those claims, *id.* at 39, Plaintiffs do not plead any facts suggesting that the unidentified officers were acting

outside the scope of their employment.  In fact, Plaintiffs allege in their complaint that *all* "Defendants' actions were taken in the course and scope of their employment with the [Secret Service or Park Police]."  ECF No. 1 ¶¶ 151, 161, 169, 176; *see Taylor v. Clark*, 821 F. Supp. 2d 370, 372-74 (D.D.C. 2011) (substituting the United States as the sole party defendant where the government's Westfall Act certification referred only to the named defendant employee and did not mention a John Doe defendant); *see also Yarullina v. United States*, 770 F. Supp. 3d 205, 210-11 (D.D.C. 2025) (accepting a Westfall Act certification for unidentified Secret Service officers).  Accordingly, Plaintiffs' assertion that Defendants' Westfall Act certification is "notably lacking" is unavailing, since Plaintiffs do not appear to challenge the correctness of the certification.  *See* ECF No. 25-1, at 39.  A Westfall Act certification need only state that the employee was acting within the scope of his employment at the time of the underlying events, *see* 28 U.S.C. § 2679(d)(2), and Defendants' certification plainly satisfies those requirements, *see Osborn*, 549 U.S. at 233 ("As is customary, the certification stated no reasons for the determination.").

Plaintiffs also appear to argue that the named officers "remain named defendant parties" to their negligence and IIED claims.  ECF No. 25-1, at 38-39.  But Plaintiffs misunderstand the effect of a Westfall Act certification.  When the Westfall Act applies, the "tort suit automatically converts to an FTCA action 'against the United States' [and] the Government becomes the *sole* party defendant."  *Harbury v. Hayden*, 522 F.3d 413, 416 (D.C. Cir. 2008) (emphasis added) (quoting 28 U.S.C. § 2679(d)(1)).  Accordingly, the United States is properly substituted as the sole Defendant for Plaintiffs' FTCA claims.

## 2.      Negligent training, supervision, and retention claims (Counts III and IV)

The United States argues that the court lacks subject-matter jurisdiction over Plaintiffs' negligent training, supervision, and retention claims because the United States is immune from suit under the FTCA's discretionary-function exception.   ECF No. 23-1, at 9-17.   Plaintiffs disagree and, in the alternative, request jurisdictional discovery concerning internal Secret Service and Park Police policies before the court determines whether the discretionary-function exception applies.  ECF No. 25-1, at 5-10.  The court will deny the motion to dismiss Counts III and IV as premature and grant Plaintiffs' request for limited jurisdictional discovery.

The United States is immune from suit unless Congress has expressly waived the defense of sovereign immunity by statute.  *See Fed. Deposit Ins. Corp. v. Meyer*, 510 U.S. 471, 475 (1994). "Dismissal for lack of subject-matter jurisdiction under Rule 12(b)(1) is appropriate if a claim is barred by sovereign immunity."  *Groce v. Rodriguez*, 743 F. Supp. 3d 244, 248 (D.D.C. 2024). The FTCA provides "a limited waiver of sovereign immunity that makes the federal government liable . . . for certain torts of federal employees acting within the scope of their employment." *Johnson v. Veterans Affs. Med. Ctr.*, 133 F. Supp. 3d 10, 14-15 (D.D.C. 2015).  The FTCA's waiver of sovereign immunity is subject to several exceptions, including the discretionary-function exception.  Under the discretionary-function exception, the United States remains immune from suits "based upon the exercise or performance" of "a discretionary function or duty . . . , whether or not the discretion involved [was] abused."  28 U.S.C. § 2680(a); *see Cope v. Scott*, 45 F.3d 445, 448 (D.C. Cir. 1995) ("Discretionary function determinations are jurisdictional in nature.").

The Supreme Court has established a two-pronged test determine whether government conduct falls under the discretionary-function exception.  *United States v. Gaubert*, 499 U.S. 315, 322-23 (1991).  First, the challenged conduct must "involv[e] an element of judgment or choice."

23

*Id.* at 322 (alteration in original) (quoting *Berkovitz ex rel. Berkovitz v. United States*, 486 U.S. 531, 536 (1988)).  The exception does not apply "if a 'federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow,' because 'the employee has no rightful option but to adhere to the directive.'"  *Id.* (quoting *Berkovitz*, 486 U.S. at 536).  Internal guidelines may constitute this sort of mandatory directive.  *See Ignatiev v. United States*, 238 F.3d 464, 467 (D.C. Cir. 2001) (reversing dismissal for lack of subject-matter jurisdiction because the district court erred by not allowing jurisdictional discovery concerning internal Secret Service guidelines).

Second, assuming that the challenged conduct involves an element of judgment, the judgment must be "of the kind that the discretionary function exception was designed to shield." *Gaubert*, 499 U.S. at 322-23 (quoting *Berkovitz*, 486 U.S. at 536).  The exception was designed to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort," *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 814 (1984), so it "protects only governmental actions and decisions based on considerations of public policy," *Gaubert*, 499 U.S. at 323 (quoting *Berkovitz*, 486 U.S. at 537).

The court begins by addressing the second prong of the *Gaubert* test before turning to whether discovery is necessary to assess the first prong.  It is well settled in this Circuit that training, supervision, and retention decisions are grounded in social, economic, and political policy.  *See Burkhart v. Wash. Metro. Area Transit Auth.*, 112 F.3d 1207, 1217 (D.C. Cir. 1997) (explaining that "supervision decisions involve a complex balancing of budgetary considerations, employee privacy rights, and the need to ensure public safety"); *Hamilton v. United States*, No. 19-CV-1105, 2021 WL 2809124, at *5 (D.D.C. July 6, 2021) ("[C]lear D.C. Circuit precedent

establishes that 'hiring, training, and supervision choices' are 'susceptible to policy judgment.'" (quoting *Burkhart*, 112 F.3d at 1217)).  As relevant here, courts have found that "the supervision of law enforcement officers 'is exactly the kind of discretionary function that is not subject to judicial second-guessing.'" *Briscoe v. United States*, 268 F. Supp. 3d 1, 11 (D.D.C. 2017) (quoting *Bostic v. U.S. Capitol Police*, 644 F. Supp. 2d 106, 110 (D.D.C. 2009)); *see Macharia v. United States*, 334 F.3d 61, 65-68 (D.C. Cir. 2003) (finding that decisions regarding the training of guards and embassy employees, and the amount of security-related guidance that should be provided to those employees, fall under the discretionary-function exception); *Tookes v. United States*, 811 F. Supp. 2d 322, 330 (D.D.C. 2011) ("[T]he supervision and training of [U.S. Marshals] are discretionary governmental functions grounded in social, economic, and political policy."); *see also Davis v. United States*, 196 F. Supp. 3d 106, 118-19 (D.D.C. 2016) (concluding that the Transportation Security Administration's decisions with regard to training canines were grounded in public policy).

The Secret Service and Park Police's training, supervision, and retention of officers are "exactly the kind of discretionary function that is not subject to judicial second-guessing." *Bostic*, 644 F. Supp. 2d at 110.  The agencies must weigh "budgetary constraints, public perception, economic conditions, individual backgrounds, . . . [and] experience" when determining how to hire and train officers, who are responsible for protecting the White House, high-ranking government officials, and federal lands. *Burkhart*, 112 F.3d at 1217 (internal quotation marks omitted); *see* ECF No. 23-1, at 1.  The Secret Service, for example, "faces a range of difficult choices when allocating its limited resources and pursuing its important objective of protecting"

25

the President.  *Davis*, 196 F. Supp. 3d at 119.  Such decisions necessarily entail the exercise of political, social, or economic judgment, satisfying the second *Gaubert* prong.[7]

This leaves the first prong of the discretionary-function test.  The United States "could still be liable if '[Plaintiffs'] injury resulted from a government employee's failure to follow a specific, mandatory policy requiring a particular course of action.'"  *Id.* (quoting *Singh v. S. Asian Soc'y of George Washington Univ.*, No. 06-CV-574, 2007 WL 1521050, at *4 (D.D.C. May 21, 2007)).  To making this showing, Plaintiffs must point to some "statute, regulation, or policy [that] specifically prescribes" how the Secret Service and Park Police should train, supervise, or retain their officers.  *Gaubert*, 499 U.S. at 322 (quoting *Berkovitz*, 486 U.S. at 536).  The United States argues that Plaintiffs have failed to identify any such mandatory policy governing the challenged conduct.  ECF No. 23-1, at 12.  Plaintiffs counter that they should be granted limited jurisdictional discovery because the court's determination of whether the officers "failed to follow existing policy necessarily requires the analysis of a factual record that does not exist in the instant case."  ECF No. 25-1, at 8.  The court agrees with Plaintiffs.

The D.C. Circuit has held that "where 'facts [are] necessary to establish jurisdiction,' plaintiffs must be afforded the 'opportunity for discovery of [such] facts . . . prior to' the granting

---

[7] Plaintiffs also argue that the United States is not immune from suit because their claims challenge "ministerial functions," rather than discretionary ones.  ECF No. 25-1, at 6-7 (asserting that the claims challenge the United States's failure to "sufficiently implement[] policies already in place," not "an agency failure as to policy development, which *would* fall under the discretionary function exception").  But, as the United States notes, Plaintiffs' reliance on the "ministerial-discretionary dichotomy" is misplaced, since that distinction derives from a theory of sovereign immunity that applies to the District of Columbia in suits brought under 42 U.S.C. § 1983 and is inapposite here.  *See* ECF No. 27, at 5-7 (explaining that the cases relied upon by Plaintiffs concerned the District's immunity, not the federal government's immunity under the FTCA); *see also Cherry v. District of Columbia*, 330 F. Supp. 2d 216, 228 (D.D.C. 2018) ("To determine whether the District is immune to liability, we have long relied upon the 'ministerial-discretionary' test." (quoting *Casco Marina Dev., LLC v. D.C. Redevelopment Land Agency*, 834 A.2d 77, 81 (D.C. 2003))).

of a motion to dismiss for lack of subject matter jurisdiction." *Loughlin v. United States*, 393 F.3d 155, 167 (D.C. Cir. 2004) (alterations in original) (quoting *Ignatiev*, 238 F.3d at 467).  Courts in this Circuit therefore often grant limited jurisdictional discovery when plaintiffs challenge the application of the FTCA's discretionary-function exception.  *See, e.g.*, *id.* at 166-68 (affirming the district court's decision to grant jurisdictional discovery regarding the existence of binding directives); *Ignatiev*, 238 F.3d at 467 (reversing the district court's denial of limited jurisdictional discovery regarding whether the Secret Service maintained internal guidelines that created mandatory duties); *Woodruff v. United States*, No. 16-CV-1884, 2017 WL 4286190, at *3 (D.D.C. Sep. 26, 2017) (permitting jurisdictional discovery because the plaintiff "must 'be given an opportunity' to discover whether, if they exist, [certain] documents impose mandatory duties on correctional staff" (quoting *Ignatiev*, 238 F.3d at 467)); *Sledge v. United States*, 723 F. Supp. 2d 87, 95 (D.D.C. 2010) ("In order to determine whether the discretionary function exception applies to Plaintiffs' FTCA claims, the Court must consider factual matters outside the complaint.").

The United States argues that jurisdictional discovery is unnecessary because there are no applicable statutes, regulations, directives, or policies that impose a mandatory duty regarding training, supervision, or retention.  ECF No. 23-1, at 12-14.  In support of this assertion, the United States offers declarations from Deputy Chief of the Secret Service Uniformed Division Andrew Ackley and Park Police Lieutenant Daniel Wavra.[8]  ECF Nos. 23-2, 23-3; *see* ECF No. 23-1, at 12-14.  Deputy Chief Ackley states in his declaration that his "duties include both the training and curriculum for Uniformed Division Officers," No. 23-2, at 1 ¶ 2, and he attaches

---

[8] The court may consider these materials outside the pleadings to determine whether to grant a Rule 12(b)(1) motion. *Jerome Stevens Pharms.*, 402 F.3d at 1253.

various documents outlining the formal and informal training officers receive, the agency's supervisory practices, and the performance-evaluation process, *id.* at 4-32.[9]  He asserts that these attachments "are the only Secret Service policies and directives directly relevant to Plaintiff[s'] negligent supervision, training, and retention claims of which [he is] aware."  *Id.* at 2 ¶ 7.  For his part, Lieutenant Wavra, who serves as Commander of the Park Police's Employment Development Office, states that he has "personal knowledge of the [Park Police's] policies and regimes for training and . . . officer supervision and retention."  ECF No. 23-3, at 1 ¶¶ 1-2.  He describes the initial and ongoing training that Park Police officers must complete, *see id.* at 1-2 ¶¶ 4-5, explaining that "[t]he content and parameters of [the Park Police's] training regimen are not imposed by mandatory authority, and the agency has discretion to determine how to best accomplish the training goals established by the agency's training policy," *id.* at 2 ¶ 6.  According to the United States, these declarations establish that "no specific training requirements exist as applicable to the allegations raised here" and that the Secret Service and Park Police "did not fail to follow any mandatory procedures."  ECF No. 27, at 3-4.  Plaintiffs counter that these declarations are "self-serving" and potentially incomplete.  ECF No. 25-1, at 8-10.

While the United States may be correct that no such mandatory policies exist, Plaintiffs must "be given an opportunity for discovery of facts necessary to establish jurisdiction prior to decision of a 12(b)(1) motion."  *Ignatiev*, 238 F.3d at 467.[10]  Plaintiffs contend that they need

---

[9] When citing ECF Nos. 23-2 and 23-3, the court refers to the CM/ECF-generated numbers at the top of each page rather than any internal pagination.

[10] Another judge in this district recently found that the discretionary-function exception did not apply where the plaintiff alleged that the Secret Service "breached mandatory policies by not providing required training at the mandated frequency."  *Yarullina*, 770 F. Supp. 3d at 213.  There, the plaintiff had identified a Secret Service policy mandating use-of-force training at a certain

(*continued on next page*)

discovery to identify "non-public policies and directives" containing mandatory obligations that the United States may have breached. ECF No. 25-1, at 7-10; *see Woodruff*, 2017 WL 4286190, at \*3 ("When the United States asserts the discretionary function exception, an agency's internal guidelines may qualify as 'facts necessary to establish jurisdiction' because they 'can be an actionable source of a mandatory obligation.'" (quoting *Ignatiev*, 238 F.3d at 467)). While Plaintiffs do not refer to any specific Secret Service or Park Police procedures, their "failure to allege the existence of an internal policy is not dispositive at this early stage." *Briscoe*, 268 F. Supp. 3d at 13 (granting jurisdictional discovery despite the plaintiffs' "summary and scarce" allegations regarding a failure to supervise); *see Ignatiev*, 238 F.3d at 467 n.4 (noting that a declaration or affidavit by the head of the Secret Service's Uniformed Division would likely not be sufficient to justify dismissal under Rule 12(b)(1)).

Because it would be premature to resolve the first *Gaubert* prong without giving Plaintiffs an opportunity to conduct limited jurisdictional discovery, the court will grant Plaintiffs' request for discovery and deny without prejudice the United States' motion to dismiss the negligent training, supervision, and retention claims for lack of jurisdiction under Rule 12(b)(1). *See, e.g.*, *Briscoe*, 268 F. Supp. 3d at 13. Discovery will be "strictly limited to jurisdictional issues," *Wesberry v. United States*, 205 F. Supp. 3d 120, 136 (D.D.C. 2016), and focused on whether any Secret Service or Park Police regulations, policies, or procedures governed the training,

---

frequency, *id.*, suggesting that, with the aid of limited discovery, Plaintiffs may be able to identify an actionable source of mandatory obligations related to the training of Secret Service officers that is applicable here.

supervision, and retention of the officers with respect to the claims at issue, and if the United States violated those directives.[11]

In light of the court's decision granting jurisdictional discovery, the court will also deny without prejudice the United States' motion to dismiss the negligent training, supervision, and retention claims for failure to state a claim under Rule 12(b)(6). *See Diamond Chem. Co. v. Atofina Chems., Inc.*, 268 F. Supp. 2d 1, 19 (D.D.C. 2003) ("[A]llowing Plaintiff to pursue its jurisdictional discovery . . . will also suffice to answer the question of whether or not it failed to state a claim upon which relief may be granted."). Following the completion of jurisdictional discovery, the United States may renew its motion to dismiss.

### 3.    IIED claims (Counts VII and VIII)

To bring an IIED claim under District of Columbia law, a plaintiff must allege "(1) extreme and outrageous conduct by the defendant that (2) intentionally or recklessly (3) caused the plaintiff severe emotional distress." *Robertson v. District of Columbia*, 269 A.3d 1022, 1033 (D.C. 2022). "The requirement of outrageousness is not an easy one to meet." *Drejza v. Vaccaro*, 650 A.2d 1308, 1312 (D.C. 1994). As to the first element, the conduct alleged must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be

---

[11] The United States argues that any discovery should exclude the Park Police because Plaintiffs' complaint fails to identify anyone from the Park Police with specificity, other than naming its leadership, and fails to allege that "the most senior member of the Park Police was directly (or even indirectly) involved with the facts at issue here." ECF No. 27, at 5. But Plaintiffs allege in their complaint that "Defendants Monahan and Taylor failed to train or negligently trained their employees, including United States Park Police Officers Doe 1-10, in lawful manners of investigation, arrest, use of force, and search and seizure." ECF No. 1 ¶ 109. While the court agrees that the complaint contains scarce facts about the Park Police officers' allegedly negligent training, supervision, and retention, *see id.* ¶ 37, Plaintiffs' allegations sufficiently implicate the Park Police to justify limited jurisdictional discovery at this time.

regarded as atrocious, and utterly intolerable in a civilized community." *Amobi v. D.C. Dep't of Corr.*, 755 F.3d 980, 995 (D.C. Cir. 2014) (quoting *Bernstein v. Fernandez*, 649 A.2d 1064, 1075 (D.C. 1991)).  IIED has been described as "a very narrow tort with requirements that are rigorous[] and difficult to satisfy." *Hargraves v. District of Columbia*, 134 F. Supp. 3d 68, 93 (D.D.C. 2015) (quoting *Snyder v. Phelps*, 562 U.S. 443, 464-65 (2011) (Alito, J., dissenting)).  The United States argues that Plaintiffs fail to allege extreme and outrageous conduct or severe emotional distress. ECF No. 23-1, at 43-44.  The court concludes that Plaintiffs have sufficiently alleged extreme and outrageous conduct but have not alleged sufficient facts establishing severe emotional distress. The court will accordingly dismiss Plaintiffs' IIED claims without prejudice and allow Plaintiffs to amend their complaint to allege facts showing that they suffered severe emotional distress.

In determining whether alleged conduct is extreme and outrageous, the court must consider the specific context in which the conduct occurred.  *See King v. Kidd*, 640 A.2d 656, 668 (D.C. 1993).  While "not every rough arrest or unfortunate interaction with police officers gives rise to an IIED claim," allegations of "particularly egregious and improper police conduct" can survive a motion to dismiss.  *Lin v. District of Columbia*, 268 F. Supp. 3d 91, 103 (D.D.C. 2017). Here, Plaintiffs allege that Secret Service officers "ramm[ed] a vehicle into the parked vehicle Plaintiffs were in with their infant children inside." ECF No. 1 ¶ 155.  The officers then pointed guns at them and "detain[ed] Plaintiffs while their infant children were kept away from them and left alone," *id.* ¶ 155; *see id.* ¶ 144, in a "hot vehicle, crying hysterically for their mothers," *id.* ¶ 35.  And, even though Plaintiffs did not match the description of the Black men who had allegedly stolen a vehicle, the officers detained and kept Plaintiffs "away from their infant children for the better part of an hour," despite Plaintiffs' "pleading to be closer to their children," and they

refused to allow Ms. Winston to breastfeed her son.  *Id.* ¶¶ 39-44; *see* ECF No. 25-1, at 37.  These allegations are sufficient to allege extreme and outrageous conduct.

A court considered analogous conduct in *Chen v. District of Columbia*, 256 F.R.D. 267 (D.D.C. 2009), where the plaintiff alleged that police had detained her based on a mistaken belief that she had not paid her hotel bill, shouted at her, slammed her against a police car, and transported her against her will to the hotel, where she was searched by a male officer.  *Id.* at 269, 272-73. The court concluded that the plaintiff had alleged extreme and outrageous conduct to survive a motion to dismiss.  *Id.* at 273.  Here, too, the officers violently struck Plaintiffs' parked vehicle while Plaintiffs and their infant children were inside, used force to detain Plaintiffs for nearly an hour even though they did not match the description of the suspects, and refused to allow Ms. Winston to breastfeed her six-month-old son.  The United States argues that Plaintiffs were searched by a female officer, not a male officer, and that officers later contacted emergency medical services to "assess the condition" of Plaintiffs' children.  ECF No. 1 ¶ 39; *see id.* ¶ 36; ECF No. 27, at 23.  Even so, the court concludes that Plaintiffs' allegations are sufficiently similar to *Chen* and other cases in this district finding extreme and outrageous conduct at the pleading stage.  *See, e.g.*, *Daniels v. District of Columbia*, 894 F. Supp. 2d 61, 68 (D.D.C. 2012) (concluding that allegations that police officers "pushed, shoved, and jerked" a pregnant plaintiff, cursed at her, and subjected her to an "intentionally violent ride" to the police station were sufficient to survive a motion to dismiss); *Drayton ex rel. Est. of Estep v. District of Columbia*, No. 24-CV-3023, 2026 WL 74133, at *17 (D.D.C. Jan. 9, 2026) (denying a motion to dismiss an IIED claim where the plaintiff alleged that police "chased, tackled, and handcuffed" her nine-year-old son, "causing him to cry and wet himself," and mocked the child (internal quotation marks omitted)); *see also District of Columbia v. Tulin*, 994 A.2d 788, 791, 800-01 (D.C. 2010) (upholding a jury verdict on an IIED

claim where an off-duty officer rear-ended the plaintiff, falsely reported on the radio that the officer was in distress, and pressured her subordinate to arrest the plaintiff); *Cotton v. District of Columbia*, 541 F. Supp. 2d 195, 206 (D.D.C. 2008) (denying summary judgment on an IIED claim where an officer forced the plaintiff, whom he knew was not dangerous, to the ground and threatened to have the plaintiff's children taken away by child protective services).

The United States argues that Plaintiffs cannot show that the officers' use of force was "objectively unreasonable"—as required for an excessive-force claim—so it follows that their allegations fail to establish extreme and outrageous conduct. ECF No. 23-1, at 43-44. But, as noted, Plaintiffs' IIED claims do not rest solely on the officers' use of force in effectuating a traffic stop or arrest: they point to additional conduct by the officers, such as refusing to allow Ms. Winston to breastfeed her son while he was hysterically crying in a hot vehicle. ECF No. 1 ¶ 35. Moreover, at the time Secret Service officers rammed into Plaintiffs' vehicle, the vehicle was stationary in a lawful parking space. *Id.* ¶¶ 20-22. Plaintiffs were not resisting arrest, disobeying orders from law enforcement, or attempting to flee, distinguishing this scenario from the cases relied upon by the United States. *See* ECF No. 23-1, at 44 (citing cases dismissing IIED and excessive-force claims—all at summary judgment—where the plaintiff had attempted to escape or resist arrest). Assuming the truth of Plaintiffs' allegations and drawing all reasonable inferences in their favor, Plaintiffs posed little threat to law enforcement that would have justified officers ramming into their parked vehicle, separating them from their infant children, and detaining them for nearly an hour.

The United States also argues that Plaintiffs have not adequately pleaded severe emotional distress. ECF No. 23-1, at 44. The court agrees. Severe emotional distress "requires a showing beyond mere mental anguish and stress and must be of so acute a nature that harmful physical

consequences are likely to result." *Competitive Enter. Inst. v. Mann*, 150 A.3d 1213, 1261 (D.C. 2016) (internal quotation marks omitted). Plaintiffs allege that they have "suffered severe emotional distress and continue to experience daily manifestations of their fear, humiliation, trauma, and loss of dignity." ECF No. 1 ¶ 152; *see id.* ¶ 56 (alleging that Plaintiffs "suffered physical, emotional, psychological, and mental injuries which continue through today"); ECF No. 25-1, at 37-38. Such conclusory assertions of emotional distress generally cannot support an IIED claim. *See Johnson v. Paragon Sys., Inc.*, 195 F. Supp. 3d 96, 100 (D.D.C. 2016) (concluding that "general statements such as 'undue stress' and 'humiliation'" were insufficient to allege severe emotional distress); *G'Sell v. Carven*, 724 F. Supp. 2d 101, 110 (D.D.C. 2010) (dismissing an IIED claim where the plaintiffs "alleged only that they suffered, and will continue to suffer, great fear, emotional trauma and humiliation" (internal quotation marks omitted)). Plaintiffs assert in their opposition that the court "can reasonably infer that such manifestations may include and/or are not unlikely to result in 'harmful physical consequences,' such as nightmares, insomnia, anxiety or panic attacks." ECF No. 25-1, at 38 (quoting *Kotsch v. District of Columbia*, 924 A.2d 1040, 1046 (D.C. 2007)). But Plaintiffs nowhere allege that they have experienced such symptoms, and they cannot amend their complaint to include such allegations in an opposition to a motion to dismiss. *See Singh v. District of Columbia*, 55 F. Supp. 3d 55, 70 (D.D.C. 2014).

Nevertheless, the court concludes that Plaintiffs may be able to allege facts supporting their allegations of severe emotional distress. For example, Plaintiffs allege that they were transported by ambulance to the hospital after their encounter with the officers, ECF No. 1 ¶ 51, suggesting that they may be able to show that they suffered "distress of a nature so acute that 'harmful physical consequences might be not unlikely to result,'" *Johnson*, 195 F. Supp. 3d at 100 (quoting *Chen*, 256 F.R.D. at 272-73); *cf. Daniels*, 894 F. Supp. 2d at 68 (finding severe emotional distress where

a pregnant plaintiff alleged that, the day after her encounter with police, her doctor informed her that "her unborn child was experiencing stress" and the plaintiff was subsequently hospitalized in order to stabilize her pregnancy); *Chen*, 256 F.R.D. at 273 (concluding that the plaintiff adequately pleaded severe emotional distress where she alleged that, after a violent brush with law enforcement, she "developed an abiding fear of police officers," "bec[a]me scared to venture outside at night," and "experienced emotional distress so severe that she . . . had difficulty at work"). Accordingly, the court will dismiss Plaintiffs' IIED claims without prejudice and allow Plaintiffs to amend their complaint to plead additional facts supporting the severe emotional distress element. *See, e.g.*, *Kurd v. Republic of Turkey*, 374 F. Supp. 3d 37, 55-56 (D.D.C. 2019) (granting leave to amend a complaint where it was likely that the plaintiffs could allege facts sufficient to establish severe emotional distress).

### 4.    Negligence claims (Counts IX and X)

To state a negligence claim under District of Columbia law, a plaintiff must show: "(1) that the defendant owed a duty to the plaintiff, (2) [a] breach of that duty, and (3) [an] injury to the plaintiff that was proximately caused by the breach." *Poola v. Howard Univ.*, 147 A.3d 267, 289 (D.C. 2016) (quoting *Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 793 (D.C. 2011)). Plaintiffs allege that Defendants breached their "duty to exercise reasonable care in the execution of their law enforcement duties and investigation of a stolen vehicle" by ramming into their vehicle, drawing and pointing guns at them "despite Plaintiffs not meeting the description of the alleged suspects," and detaining them while their children were kept away inside the vehicle. ECF No. 1 ¶¶ 164-165, 171-172. Defendants argue that Plaintiffs' negligence claims are based on the same intentional conduct that supports their intentional tort claims and therefore must be dismissed. ECF No. 23-1, at 40-42. The court agrees.

When a plaintiff alleges claims sounding in both intentional tort and negligence, "'negligence must be distinctly pled and based upon at least one factual scenario that presents an aspect of negligence apart from' the intentional tort 'itself and [that is] violative of a distinct standard of care.'" *Lewis v. District of Columbia*, 768 F. Supp. 3d 76, 120 (D.D.C. 2025) (alteration in original) (quoting *District of Columbia v. Chinn*, 839 A.2d 701, 711 (D.C. 2003)). These requirements stem from the principle that "[i]ntent and negligence are regarded as mutually exclusive grounds for liability." *Chinn*, 839 A.2d at 706 (internal quotation marks omitted); *see Lucas v. District of Columbia*, 505 F. Supp. 2d 122, 126 (D.D.C. 2007) (explaining that "any negligence claim must be based on facts that are different from the alleged excessive force"). While Plaintiffs may plead alternative causes of action under the Federal Rules of Civil Procedure, *see* ECF No. 25-1, at 35, their "negligence claim[s] must stand on [their] own," *Roe v. Doe*, 401 F. Supp. 3d 159, 167 (D.D.C. 2019); *see Hawkins v. Wash. Metro. Area Transit Auth.*, 311 F. Supp. 3d 94, 106 (D.D.C. 2018) ("While there is no inherent inconsistency in allowing a plaintiff to plead multiple theories of liability, one cannot plead the same theory under a variety of labels under District of Columbia law.").

Plaintiffs' negligence claims are not "distinctly pled" and are instead based on the same factual allegations underlying their Fourth Amendment and IIED claims.[12] *See* ECF No. 1 ¶¶ 71-74 (alleging that the officers violated Plaintiffs' "rights under the Fourth Amendment . . . to be free from unreasonable and excessive force" by "unlawfully and intentionally striking

---

[12] Even though the court dismisses Plaintiffs' Fourth Amendment claims on different grounds, *see supra* Section IV.A, Plaintiffs may not repackage those claims under a negligence theory, *see, e.g.*, *Est. of Wilson v. District of Columbia*, No. 23-CV-1987, 2024 WL 4370850, at *3, *5 (D.D.C. Sep. 29, 2024) (dismissing both gross negligence and Fourth Amendment claims based on the same facts).

[Ms. Johnson's] vehicle," "pointing loaded weapons at Plaintiffs and their children," "detaining the Plaintiffs, physically handcuffing them, and physically restraining them"); *id.* ¶ 87 ("By arresting the Plaintiffs, physically handcuffing them, detaining them, frisking them, and restraining Plaintiffs away from their infant children, the Defendants violated the Plaintiffs' clearly established rights under the Fourth Amendment . . . to be free from unreasonable search and seizure."); *id.* ¶¶ 145, 155 (using identical language to allege IIED).  Accordingly, while Plaintiffs "add[] the word 'negligence,' th[ese] claim[s] merely reiterate[] prior allegations of intentional conduct."  *Cotton*, 541 F. Supp. 2d at 209; *see Lewis*, 768 F. Supp. 3d at 130-32 (dismissing negligent infliction of emotional distress and negligence claims that were based on the same allegations supporting the plaintiff's IIED claim).

Plaintiffs counter that they have alleged a distinct factual scenario and distinct duties supporting negligence claims based on (1) the officers' "failure to recognize or acknowledge that Plaintiffs did not meet the description of the alleged suspects," and (2) the officers' "failure to use reasonable care in keeping Plaintiffs' children alone inside a vehicle (on a summer day) while they were detained."  ECF No. 25-1, at 34.  The court is unpersuaded.

First, Plaintiffs argue that the officers breached their duty to "use reasonable diligence before acting upon their uncorroborated belief that Plaintiffs were the Black, male suspects."  ECF No. 25-1, at 35.  But this claim is "intertwined with and dependent" on Plaintiffs' Fourth Amendment claims—specifically, the officers' basis for stopping Plaintiffs.  *Stewart-Veal v. District of Columbia*, 896 A.2d 232, 235 (D.C. 2006).  Whether the officers used "reasonable diligence" in corroborating the suspect description is part and parcel of whether they had reasonable suspicion or probable cause to stop and search Plaintiffs' vehicle.  *See* ECF No. 25-1, at 27 (arguing that the officers' use of force was unreasonable under the Fourth Amendment given

that Plaintiffs "did *not* meet the descriptions of supposed suspects under investigation"); *Est. of Wilson v. District of Columbia*, No. 23-CV-1987, 2024 WL 4370850, at *5 (D.D.C. Sep. 29, 2024) (dismissing a gross negligence claim that "rest[ed] on the exact same factual scenario as . . . [the plaintiffs'] Fourth Amendment" claims); *cf. Hargraves v. District of Columbia*, No. 12-CV-1459, 2013 WL 12333597, at *3 (D.D.C. July 3, 2013) (permitting a negligence claim to proceed where the plaintiff alleged, in addition to the officers' use of excessive force, that the officers failed to act during and after their beating of him).

Plaintiffs next contend that the officers "had a duty to use reasonable care with regards to Plaintiffs' children while Plaintiffs were detained" and breached this duty "by leaving the children in a closed car." ECF No. 25-1, at 35-36. While "the same course of conduct may support both an intentional tort claim and a negligence claim," a plaintiff must show that "'the defendant, in the process of engaging in the conduct that included the intentional tort, was also breaching another recognized duty owed to the plaintiff.'" *Rice v. District of Columbi*a, 626 F. Supp. 2d 19, 24 (D.D.C. 2009) (quoting *Stewart-Veal*, 896 A.2d at 235). Plaintiffs' allegations do not clear this hurdle. As Defendants point out, Plaintiffs never allege this theory of negligence in their complaint. *See* ECF No. 27, at 22 (arguing that Plaintiffs' contention is "belied by the actual language of the operative paragraph" of their complaint). Plaintiffs allege generally in their complaint that Defendants had a "duty to exercise reasonable care in the execution of their law enforcement duties," ECF No. 1 ¶¶ 164, 171, but they do not contend that the officers acted negligently by leaving Plaintiffs' children in a "hot vehicle," *id.* ¶ 35. To be sure, Plaintiffs allege that the officers' negligent acts included "detain[ing] and falsely imprison[ing] Plaintiffs while their infant children were kept away from them and left alone inside a vehicle," *id.* ¶¶ 165, 172, but this simply restates Plaintiffs' IIED claims nearly verbatim, *see id.* ¶¶ 145, 155 (alleging IIED

based on the officers' actions in "detaining Plaintiffs while their infant children were kept away from them and left alone inside a vehicle").  Plaintiffs do not allege any negligent acts by the officers, such as "failing to follow proper protocols," *Lin v. District of Columbia*, No. 16-CV-645, 2019 WL 1597876, at *13 (D.D.C. Apr. 15, 2019), and Plaintiffs may not amend their complaint in their opposition by raising new theories of negligence, *see Singh*, 55 F. Supp. 3d at 70; *Hunter v. District of Columbia*, 824 F. Supp. 2d 125, 139-40 (D.D.C. 2011) ("Adding the word 'duty' and reiterating the allegations of intentional conduct are insufficient to plead negligence[-]based claims.").  Accordingly, the court will dismiss Plaintiffs' negligence claims.

*     *     *

In summary, the court will dismiss the Park Police, Gregory T. Monahan, Jessica Taylor, Park Police Officers Doe 1-10, the Secret Service, James M. Murray, Kimberly A. Cheatle, Daniel Mitchell, Joanne Armstrong, Jonathan Rustin, James Thornton, and Secret Service Officers Doe 1-10 as Defendants and substitute the United States as the sole Defendant for Plaintiffs' FTCA claims (Counts III, IV, VII, VIII, IX, and X); dismiss with prejudice Plaintiffs' *Bivens* claims (Counts I and II) and negligence claims (Counts IX and X); dismiss without prejudice Plaintiffs' pattern-and-practice claims (Counts V and VI) in light of Plaintiffs' withdrawal of the claims; permit Plaintiffs to conduct limited jurisdictional discovery concerning the application of the discretionary-function exception to their negligent hiring, training, and supervision claims (Counts III and IV); and dismiss without prejudice Plaintiffs' IIED claims (Counts VII and VIII) but allow Plaintiffs to file an amended complaint substantiating these claims.

### V.    CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that Defendants' Motion to Dismiss, ECF No. 23, is **GRANTED** in part and **DENIED** in part.  It is further **ORDERED** that Plaintiffs

39

shall file an amended complaint on or before April 9, 2026, and that the parties shall meet, confer, and file a joint status report on or before April 23, 2026, proposing a schedule to govern jurisdictional discovery.

**SO ORDERED.**

_____
LOREN L. ALIKHAN
United States District Judge

Date:   March 26, 2026